COURT OF APPEALS
DECISION
DATED AND FILED

July 14, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2021AP176-CR**

STATE OF WISCONSIN

Cir. Ct. No.  **2016CF142**

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

ALEX ANDRE WOUTS,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Dodge County:  JOSEPH G. SCIASCIA, Judge.  *Affirmed.*

Before Blanchard, P.J., Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Alex Andre Wouts appeals a judgment of conviction and a postconviction order denying his motion for a new trial on the

grounds of ineffective assistance of counsel and newly discovered evidence. We reject Wouts's arguments and affirm the judgment and order.

## BACKGROUND

¶2      In 2016, the State charged Wouts, a state corrections officer, with five counts of second-degree sexual assault of three inmates. *See* WIS. STAT. § 940.225(2)(h) (2019-20).[1]  Specifically, the information alleges that Wouts sexually assaulted "Chad" on November 21, 2015; "Walt" on August 24, November 7, and November 21, 2015; and "Adam" in the month of November 2015.[2]

¶3      The case proceeded to a jury trial, held over three days in May 2018. At all relevant times, the victims were inmates at Fox Lake Correctional Institution (FLCI), a medium-security prison; the victims were housed in Unit 4; and Wouts was a Unit 4 sergeant.

¶4      Chad testified in pertinent part as follows. During the relevant timeframe, Chad had a custodial position in Unit 4. As a custodian, Chad sometimes had more access than other inmates to areas within Unit 4.

¶5      At first, Chad's interactions with Wouts were the "typical" ones between a guard and an inmate. However, "after a little while [Wouts] got a little bit too comfortable"; he started asking about Chad's workouts and talking about

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] In keeping with the policy expressed in WIS. STAT. RULE 809.86, and for ease of reading, we use the State's chosen pseudonyms to refer to the victims. We also use acronyms to refer to the inmates who testified at trial.

Chad's body. Wouts eventually began treating Chad preferentially by, for example, allowing him to do his laundry for free, giving him access to items from the kitchen, and allowing him freer movement within the Unit 4.

¶6 At some point, Wouts started making Chad feel "uncomfortable" or "nervous." Chad described several incidents. For example, Wouts would ask Chad to go to the basement to get toilet paper, and Wouts would follow Chad down to the basement.

¶7 On another occasion, while Chad was in the shower, Wouts peered through a grate separating the bathroom and hallway and asked Chad, "[H]ow is my little Mexican friend doing[?]" Chad left the shower and went to his room; Wouts came to the room, flashed a light at Chad, and told Chad to come to Wouts's office. Wouts then directed Chad to go to a second office, saying that he did not want others to hear their conversation. Once in the second office, Wouts said that Chad was "a pretty good size and just bluntly asked [Chad] if he can taste [Chad]." Chad asked Wouts why he was being "so blunt," and Wouts responded that "he has been doing this for nine to ten years," that "it was his word against [the inmates']," and that he "knew where all the [camera] blind spots" were.

¶8 Chad also testified to an incident that involved Wouts and Walt, who was a friend of Chad's. Chad was in Walt's room, and Wouts came into Walt's room and sat on Walt's lap. Wouts grabbed Walt's "package," said "this is my man," and "start[ed] to jump up and down and grind on [Walt]." Wouts got up and, before leaving, "sa[id] out loud there is more where that came from."

¶9 Chad also testified to an assault that occurred on November 21, 2015. He testified that Wouts was working during the day and into early the next

3

morning.[3] That night, which was November 20, Wouts told Chad and Walt to meet him in the bathroom at 3 a.m. so that he could perform oral sex on both of them. Wouts said that he would bring a ladder to the bathroom as a "decoy," so that he could pretend that he was looking for contraband in the ceiling tiles. Chad went to the bathroom; Wouts was there but Walt was not.

¶10    Wouts told Chad to go into the last toilet stall. Wouts sat on the toilet and Chad stood in front of him. Wouts pulled down Chad's pants and underwear and briefly performed oral sex on Chad. Wouts started to unbuckle his pants, and he asked Chad to perform oral sex on him. Chad said, "I don't do that," left the stall, and tried to leave the bathroom. Wouts tried to stop Chad; Chad grabbed Wouts's shirt, said, "I don't feel comfortable," and left. Chad testified that "this incident" took approximately two minutes, although it is unclear from his testimony whether he meant that the alleged sexual contact in the bathroom stall lasted two minutes or whether the entire interaction with Wouts in the bathroom lasted two minutes.

¶11    Chad testified that, throughout his incarceration, he kept a calendar on which he wrote down events from his day. After the November 21, 2015 incident, he wrote in the calendar, "THE NIGHT IT HAPPENED @ 3:00 AM." The calendar was entered into evidence. Chad testified that he wanted to "keep[] track of" that "specific incident" so that he "wouldn't lose a day" and "would have something specific" to show authorities when he reported the incident. Chad also testified that, as soon as he returned to his room after the assault, he put

---

[3] Wouts's schedule, which was entered into evidence, reflects that he worked a sixteen-hour double shift from 2 p.m. on November 20 through 6 a.m. on November 21.

his underwear in a bag. Chad explained that he saved his underwear to help him later prove that he had been assaulted.

¶12 Chad agreed that he, along with Walt and Adam, went in Wouts's office "quite a bit." (As discussed in more detail below, this testimony is relevant to Wouts's defense that one or more of the victims might have surreptitiously obtained some of Wouts's saliva and planted it on underwear in an attempt to frame Wouts.)

¶13 Walt testified in pertinent part as follows. Wouts began acting "inappropriately" toward Walt, and "then it morphed into" "predatory" conduct. On August 24, 2015, Wouts told Walt "to meet him in the bathroom at night [at] a specific time or after [Wouts] did his rounds and made sure no one was there." Walt met Wouts in the bathroom; Wouts "grabbed" Walt, "pulled down [Walt's] pants," and "put [Walt's] penis in his mouth." Walt "froze" and did nothing because "[i]n that type of situation, I am in a lose-lose no matter what. If I fight a correctional officer, I'm not getting out of prison." Walt "c[ould]n't say" how long his penis was in Wouts's mouth, except that it was more than five seconds.

¶14 Walt also testified to an instance of sexual assault on November 7, 2015. According to Walt, that assault happened in the bathroom at nighttime. Wouts performed oral sex on Walt, and then Wouts told Walt to have anal sex with him. Walt briefly did so. Walt did not specify how long this assault took. Walt noticed that Wouts was wearing "ass-less" underwear; as Walt described it, "I didn't really see the front, but his ass was out, there was no fabric covering up the back side." Walt identified two pairs of "jock strap"-like underwear—one red and white, and the other dark blue and white—recovered from Wouts's residence as the same "style" as the underwear worn by Wouts that night. He testified that

5

the underwear recovered from Wouts's residence "appear to be the underwear that I was trying to describe."

¶15    Walt further testified to a sexual assault on November 21, 2015 (the incident Chad testified to, as summarized above).  Walt testified that he and Chad were in Wouts's office and that Wouts told them both to meet him in the bathroom at 3 a.m. so that Wouts could perform oral sex on them.  Walt was five or ten minutes late to the bathroom and saw Chad "walking out," appearing to be "all flustered."  Walt testified, "And so I walked in, [and] Wouts kind of grabbed my penis and put it in his mouth real quick and said he has been in there too long and he had to go and kind of smiled."  Walt stated that his penis was in Wouts's mouth "[l]ess than five seconds."  Walt testified that Wouts "would always have his cover," for example, by bringing a ladder into the bathroom.

¶16    Walt provided other details about his interactions with Wouts.  He gave testimony consistent with Chad's that Wouts sat on Walt's lap while Chad watched.  Walt also testified that, after the August 24, 2015 assault, he started saving the pairs of underwear he had been wearing so that they could be tested for the presence of deoxyribonucleic acid (DNA) attributable to Wouts.  Walt further testified that, prior to the November 21, 2015 assault, he and Chad talked about saving their underwear as evidence "so people believe us."  In addition, Walt testified that he kept a list of specific dates corresponding to incidents or encounters with Wouts.

¶17    Adam testified in pertinent part as follows.  He and Wouts had ongoing sexual contact that began in February or March 2015 and ended in November 2015.  Adam and Wouts would meet in the basement, the laundry room of Unit 4, or the bathroom and engage in oral or anal sex.  There were "a

lot"—*i.e.*, "over a dozen"—instances of sexual contact between the two. At some point, Adam told Wouts that he wanted to stop the sexual contact with Wouts. Wouts, however, threatened to send Adam to "the hole" (*i.e.*, segregation) if Adam stopped having sexual contact with him.

¶18     Like Walt, Adam identified the pairs of red and blue "ass-less" underwear that were recovered from Wouts's home as the type of underwear he saw Wouts wearing. Adam also testified that Wouts would bring a ladder with him to the bathroom so that he could make it seem as though he had a good reason to be there, looking for contraband.

¶19     Adam testified to a specific instance of sexual contact that occurred in November 2015. On that occasion, he went to the basement to mop up a puddle. Wouts performed oral sex on him, and Adam's feet and the bottom of his sweatpants got wet.

¶20     In related testimony, another inmate, D.P., testified that he once observed Adam walk out of the basement with wet feet. D.P. asked Adam "what was going on," and Adam said that he would tell D.P. later. D.P. "just thought it was odd because we have a friendly rapport and he looked distraught." Then, "[p]robably about 30 seconds later," Wouts walked out of the basement.[4]

---

[4] Based on the complaint, information, and trial transcript, it is unclear whether the charge presented to the jury and alleged to have occurred in November 2015 stems from the alleged sexual assault in the basement when Adam's feet and pants got wet. There is some indication in the record that the November 2015 charging period corresponds to a separate alleged assault involving Adam and Wouts having anal intercourse in the bathroom. At trial, however, Wouts's counsel appeared to assume that the November 2015 assault involved alleged oral sex in the basement. Moreover, on appeal, the State asserts that "[i]t charged the incident that occurred in November [2015] when [D.P.] saw Adam walk out of the basement with wet feet and 30 seconds later saw Wouts walk out." Wouts does not dispute this point in his reply. We assume without deciding that the charge concerning Adam and alleged to have occurred in

(continued)

7

¶21 Rebecca Bohr, a DNA analyst at the Wisconsin State Crime Laboratory, testified that she performed DNA testing on a substance identified as saliva recovered from a pair of Walt's underwear. Bohr testified,

> Given that [Walt] is the source of the major contributor of the [DNA] mixture profile[,] [one would be] at least 7 billion times more likely to observe that evidence profile if it is a mixture of DNA from [Walt] and Alex Wouts than if it is from [Walt] and a random unrelated individual.

Alan Friedman, a DNA expert for the defense, testified that it was not possible to determine whether Wouts himself transferred his DNA to Walt's underwear or whether there was a "secondary transfer"—*i.e.*, whether "Wouts's DNA was transferred from another item or material to those underwear." Friedman testified that the DNA could have been transferred to the underwear from "a cup, glass, silverware, [or] a tooth brush."

¶22 The jury returned a guilty verdict on each of the five counts, and the court imposed a cumulative sentence of thirty-five years of initial confinement and twenty-five years of extended supervision.

¶23 Wouts brought a motion for postconviction relief, raising claims of ineffective assistance of counsel and newly discovered evidence. Following a *Machner*[5] hearing, the court denied the motion. Wouts appeals. We will set forth additional facts where relevant to our analysis.

---

November 2015 relates to the assault in the basement when Adam's feet and pants got wet. This assumption does not matter to our analysis of ineffectiveness and to our dispositive conclusions that trial counsel was not ineffective.

[5] *See* ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (1979).

## PRINCIPLES OF LAW AND STANDARDS OF REVIEW

¶24    Wouts raises several claims of ineffective assistance of trial counsel. A defendant is denied the Sixth Amendment right to counsel when the defendant demonstrates that counsel's deficient performance prejudiced the defendant at the trial or other proceeding. *State v. Pico*, 2018 WI 66, ¶18, 382 Wis. 2d 273, 914 N.W.2d 95. Deficient performance means that counsel's acts or omissions fell outside the "wide range of professionally competent assistance." *Id.*, ¶19, quoting *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Prejudice to the defendant means that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Pico*, 382 Wis. 2d 273, ¶20, quoting *Strickland*, 466 U.S. at 694. The defendant bears the burden of demonstrating deficient performance and prejudice. *Pico*, 382 Wis. 2d 273, ¶20.

¶25    A claim of ineffective assistance of counsel presents a mixed question of fact and law. *Id.*, ¶13. We uphold the circuit court's factual findings unless clearly erroneous, but we determine de novo whether those facts demonstrate ineffective assistance. *Id.*

¶26    In the alternative, Wouts argues that he is entitled to a new trial based on newly discovered evidence. To set aside a judgment of conviction based on newly discovered evidence, the defendant must prove that: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. Plude*, 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (quoted source omitted). If the defendant proves these four criteria, then the circuit court must determine "whether a reasonable

probability exists that had the jury heard the newly-discovered evidence, [the jury] would have had a reasonable doubt as to the defendant's guilt." *Id.* "A reasonable probability of a different outcome exists if there is a reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt as to the defendant's guilt." *Id.*, ¶33 (internal quotation marks and quoted source omitted).

¶27 The decision to grant or deny a motion for a new trial on the basis of newly discovered evidence is committed to the circuit court's discretion, meaning we review for an erroneous exercise of discretion. *State v. Avery*, 2013 WI 13, ¶22, 345 Wis. 2d 407, 826 N.W.2d 60.

## DISCUSSION

*I. Trial Counsel Was Not Ineffective for Failing to Demand a More Specific Date for Count Five of the Information (the Count Involving Adam).*

¶28 Wouts argues that the complaint and information were constitutionally defective as to count five (the count involving Adam) because they alleged only that the assault occurred "in the month of November 2015." *See State v. Fawcett*, 145 Wis. 2d 244, 249-55, 426 N.W.2d 91 (Ct. App. 1988) (a defendant has due process and Sixth Amendment rights to a sufficiently definite notice of charges; the test is whether the charging document is sufficient to enable the defendant to prepare a defense and to protect against double jeopardy). Wouts argues that a one-month-long charging period is impermissibly vague, in that it precluded him from mounting a full defense to the charge. It follows, Wouts argues, that trial counsel was ineffective for failing to "challeng[e] the charging period as alleged."

10

¶29 The parties explored this issue at the ***Machner*** hearing. When trial counsel was asked whether he had "ever left unchallenged a one month charging period on a sexual assault on an adult [d]efendant," counsel testified that he had brought motions challenging timeframes in other cases but had "[n]ever been successful in" making such a challenge. Moreover, counsel testified, his trial strategy was to characterize Walt and Chad as "orchestrating" and then "g[etting Adam] on board with" false assault allegations, meaning that counsel wanted to highlight that Adam "wouldn't go into any of the specifics anyway." Counsel testified that the strategy was to "harp on" the "whole issue [of] time, time, time, when did that happen," to show that Adam, at least, could not provide specific details about the assault. Thus, counsel testified, "[I]t was a choice we made." Counsel further implied that he did not bring a motion because he was aware of the possibility that the State "was threatening to charge [Wouts] with more" assaults against Adam and, as a result, feared that calling attention to the timing issue in this way might prompt the State to file these additional charges. Finally, trial counsel testified that he was able to properly prepare a defense based on the allegations in the charging document.[6]

---

[6] On further questioning, trial counsel also explained that he did not move for a more definite statement on count five because Wouts told counsel that he had committed the assaults. Trial counsel testified that, under those circumstances, such a motion would "perpetrate a fraud on the Court." However, Wouts testified that he did *not* tell counsel that he had committed the assaults. The postconviction court did not make factual findings about whether Wouts admitted to counsel that he had committed the assaults. The postconviction court also did not make factual findings about which considerations guided counsel's ultimate determination not to make this motion. It is not inconsistent, however, for counsel to have declined to make this motion both for the strategic reasons discussed in the text above and out of the belief that doing so would perpetrate a fraud on the court. Accordingly, our analysis is based on counsel's testimony concerning the various strategic reasons, apart from the fraud-on-the-court rationale, for his not bringing this motion.

¶30     The trial transcript reflects that trial counsel pursued a strategy of portraying Adam's testimony as vague and his allegations as "orchestrated" by Chad and Walt.  For example, counsel asked Adam why he did not keep a journal or write down details about when he was allegedly assaulted.  In addition, counsel asked Adam whether he was "very friendly" with, or frequently exercised with, Chad and Walt, in an attempt to elicit testimony supporting the defense's position that Chad, Walt, and Adam were all friends.

¶31     Then, in closing, trial counsel argued that Adam had to be "led," "give[n] leading questions," and reminded by the prosecutor of many of the details of the assault in the basement.  Thus, counsel argued, the testimony was too vague and contradictory to support a jury determination that this assault occurred as alleged:

> There is no corroboration.  I asked him about that…. [Adam] says it happened in February, ladies and gentlemen.  [The State] has to lead him to March.  Well, it's not a big deal for a month difference, but it is when you take all these into consideration because again he doesn't know any dates.
>
> Count 5 has to do with him and … the State just … says it happened in November of 2015.  No, that's not good enough.  That's not what the Count is.  You have to find him not guilty because there is nothing, ladies and gentlemen, that said it happened in November because he doesn't know dates.  Nothing.
>
> Then he says it happened in the bathroom.  He says March and April.  And then [the State] has to ask him even on Direct Examination well, you said it happened in November, do you remember that.  Oh, yeah, now I remember it was November.
>
> ….
>
> If he is supposed to be remembering this stuff, why does he have to be reminded about dates, events, times, but we still don't know when it happened with regard to it.

12

¶32 "Trial strategy is afforded the presumption of constitutional adequacy," meaning that "[r]eviewing courts should be highly deferential to counsel's strategic decisions and make every effort … to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time." *State v. Breitzman*, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93 (internal quotation marks and quoted source omitted; second alteration in original). Thus, a reviewing "court will not second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment." *Id.* (internal quotation marks and quoted source omitted; alteration in original).

¶33 We conclude that trial counsel's testified-to strategy for not bringing a motion for a more definite charging period was not irrational or capricious. *See id.* Instead, this strategy represented counsel's reasoned view that the motion could lead to the State's filing additional charges and would have likely resulted in one of two additional outcomes: (1) the motion would have been denied,[7] or, alternatively; (2) the motion would have resulted in the prosecution amending the information to incorporate a more specific timeframe, which potentially could have undermined the defense's attempts to portray Adam's testimony as vague and not credible. Moreover, the record reflects that trial counsel in fact attempted to use the one-month-long charging period to Wouts's advantage, by arguing in closing that Adam's testimony was vague and

---

[7] We note that Wouts has not cited, and we have not identified, any case law concluding that a charging period similar to the one-month-long charging period here is impermissible. The lack of such case law supports the reasonableness of trial counsel's apparent view that the circuit court would likely have denied the pretrial motion in this case.

inconsistent. Counsel also implied that the jury could not or should not convict Wouts on this charge because there was no specific evidence about when in November the assault occurred.

¶34    We are not permitted to second-guess counsel's reasonable trial strategy. Instead, we conclude that Wouts has not met his burden of establishing that trial counsel performed deficiently by not challenging the charging period for count five. Accordingly, Wouts's claim of ineffective assistance of counsel fails. *See Strickland*, 466 U.S. at 697 (we need not address both the "deficiency" and "prejudice" prongs of an ineffective assistance claim where our decision on one prong is dispositive).

## II. *Counsel Was Not Ineffective for Failing to Present Certain Evidence at Trial.*

¶35    Wouts argues that trial counsel was ineffective for not adequately investigating and preparing for trial, in that trial counsel did not obtain evidence later elicited and presented at the *Machner* hearing that would have been helpful to the defense. This evidence is as follows:  (1) floorplans of Unit 4 of FLCI, including camera placements and sightlines; (2) photographs of Unit 4 rooms and hallways; (3) videos filming the layout of Unit 4; (4) work schedules of Wouts's coworkers in Unit 4; (5) the victims' cell assignments; and (6) testimony from Wouts's coworkers. Wouts contends that this evidence would have more robustly supported his trial theory that the victims were lying about the assaults and that they had framed him by planting his DNA in their underwear.[8]

---

[8] As with trial counsel's rationale for not challenging the one-month charging period for count five (*see* note 6), trial counsel testified at the *Machner* hearing that part of the reason he did not seek to obtain a floorplan or take videos of Unit 4 was because of Wouts's alleged

(continued)

¶36    As to (1) through (5), above, Wouts has not demonstrated a reasonable probability that presenting this evidence at trial would have led to an acquittal.  Our review of the record reveals that this video and documentary evidence is consistent with the trial witnesses' descriptions of the physical layout of Unit 4.  Moreover, Wouts does not explain how this evidence would have been directly favorable to his trial defense.  Instead, he focuses on how the evidence complements the testimony of the *Machner* hearing witnesses.  Accordingly, to the extent Wouts means to argue that this evidence in and of itself would have changed the trial's result, we reject this argument.

¶37    Therefore, we turn to whether counsel was ineffective with regard to the testimony of correctional staff elicited at the *Machner* hearing, in conjunction with these hearing exhibits.

A.  Summary of testimony presented at *Machner* hearing

¶38    Wouts's coworkers and supervisor testified at the *Machner* hearing. We summarize this testimony by topic.

> *i. The physical layout of Unit 4 and the inmates' access to areas within that unit*

¶39    The witnesses testified to the following about the physical layout of, and the inmates' access to various areas within, Unit 4—the unit where Wouts worked, where the victims were housed, and where the assaults were alleged to have occurred.

---

admission of guilt to him.  Because we conclude for other reasons that counsel was not ineffective in this regard, we do not further analyze counsel's stated rationale.

¶40     Two correctional officers worked at a time in Unit 4, one in the "C-D wing" and the other in the "A-B wing." At all relevant times, Wouts worked in the "C-D wing" of Unit 4—the same wing where the victims were housed.

¶41     Each officer had his or her own staff office, referred to as a "bubble." The bubbles had glass walls, so a person outside a bubble could see inside. These bubbles were on opposite ends of Unit 4, approximately sixty or seventy feet apart. If one correctional officer were away from his or her bubble, there would be "no expectation" that a different officer would take his or her place in that bubble.

¶42     The layout of Unit 4 was such that noise "travel[ed] real good." However, "a regular voice or hushed voice wouldn't necessarily be audible ... from the other end of the unit" (*i.e.*, audible to the officer sitting in the bubble at the other end of the unit).

¶43     On some occasions, inmates would be able to overhear conversations between correctional staff. Inmates would try to overhear conversations so that they could learn about staff and try "to gain favor." Wouts's coworker Mary Bobiak testified that in the spring of 2015, she had conversations with Wouts about biking, including about what her son should wear while biking. In discussing bike shorts, Wouts told Bobiak that "most people either wear a jock strap or they don't wear anything" under bike shorts but that a "[j]ock strap was recommended as being most comfortable for most men."

¶44     In 2015, there was a grate in the inmate bathroom that could serve as an "observation port," meaning that a person in the hallway would be able to look into the bathroom and also hear noises from the bathroom. Therefore, if one

person were in the bathroom washing his hands or talking, a second person located in the hallway or in the nearby bubble would be able to hear that noise or conversation—at least so long as that second person were "trying to pay attention." On the other hand, during the third shift, if one officer were in an inmate bathroom, there would be "no expectation" that the other officer would be able to hear or see anything in that bathroom, presumably because the other officer would be in his or her bubble at the other end of the unit.

¶45    The inmates did not have individual bathrooms in their rooms; instead, they had to leave their rooms to use a communal bathroom. Inmates were able to use the bathroom "[a]ll night long," and "a lot" of inmates stayed up all night. Therefore, there was "constant traffic" in and out of the bathroom, and "[a]nything unusual going on, either [staff] [we]re going to pick up on it from the noise coming from in the bathroom or the inmates [we]re going to tell [staff] about it."

¶46    There were cameras positioned throughout Unit 4, but there were also numerous camera "blind spots," of which correctional staff were aware. Inmates knew that there were video cameras in Unit 4. FLCI saved some videos from those cameras for only seven days, and it is possible that inmates were generally aware of this limited retention policy. There was no testimony about Walt's, Chad's, or Adam's knowledge of FLCI's video retention policies.

*ii. The victims' ability to frame Wouts by obtaining his DNA*

¶47    The coworkers also provided testimony relevant to Wouts's trial strategy that the victims had the motives and means to frame him, in part by planting his DNA in their underwear. Wouts elicited the following relevant testimony on these points.

17

¶48     Regarding the potential availability of Wouts's saliva, Wouts frequently ate sunflower seeds and spit them into a Styrofoam cup. Wouts also routinely drank coffee out of a Styrofoam cup, and he ate all of his meals at FLCI. An observer looking into the bubble would be able to see Wouts eating and drinking.

¶49     An inmate would not normally be allowed in a bubble without supervision. A janitor, however, would be able to go in and out of a bubble without necessarily being supervised. There were several types of Unit 4 janitors, with varying roles. The "center hall" janitor cleaned the bubbles in Unit 4 two or three times a day, at the end of each officer's shift. These janitors would know that all of the trash they were collecting came from the officer occupying that bubble. A janitor cleaning the bubble would be able to remove trash from the waste basket and put it in his pocket or waistband, without being noticed.

¶50     Chad became a janitor on August 21, 2015. There was no testimony that Chad was a "center hall" janitor or that Chad ever cleaned Wouts's bubble.

### iii. The likelihood that the sexual assaults could have happened as alleged

¶51     Wouts elicited the following testimony from his coworkers regarding the likelihood that the assaults could have happened as they were testified to by the victims and, in particular, that Wouts could have committed numerous sexual assaults against Adam.

¶52     Catherine Schmitz, a Unit 4 sergeant, testified in pertinent part as follows. Schmitz frequently worked with Wouts during the relevant timeframe. Schmitz agreed with postconviction counsel that, "if somebody wants some

privacy to do something in the bathroom for five to seven minutes … there is a high probability that someone may interrupt" that person in the bathroom. Schmitz further agreed that "maybe once somebody could be in [the bathroom] for five to seven minutes without interruption, but if it happens dozens of times it would be pretty likely somebody else would notice."

¶53    In addition, if another correctional officer were "gone over 15 minutes, especially on third shift, [Schmitz] would probably walk down the hall to check where they were," and the "same thing on second shift."  Moreover, if another guard went down to the basement, Schmitz would "start to wonder if something is up" if the guard had been gone for more than five minutes. However, Schmitz agreed that if an officer were "gone five to seven to nine minutes, that wouldn't in the normal course … trigger … anything until they were gone a little bit longer."

¶54    Relatedly,   the   following   exchange   took   place   between postconviction counsel and Schmitz:

> [Counsel]:    You've heard the allegation … that [Wouts] had sex with three different inmates[,] with one [inmate] dozens or maybe 50 times between August 1st and the end of November.[9]

---

[9] As we later discuss in more detail, there was no testimony presented at trial that Wouts had sexual contact up to fifty times with an inmate between August 1 and the end of November/early December 2015.  Although the August to November time period was the relevant time period for the *charged* offenses, Adam testified that the period for the repeated (and largely *uncharged*) sexual contact between him and Wouts was between February or March and the end of November 2015, an approximate nine-month period.  As shown in further questioning in the text above, postconviction counsel at the *Machner* hearing repeated the August through late November/early December time period in questioning other witnesses.

> Given the confines of this area, do you think that's possible at all without you noticing?

[Schmitz]: I don't think so, no.

[Counsel]: Do you think it's possible with the other guards or whoever else worked with [Wouts] not noticing?

[Schmitz]: No.

[Counsel]: Why do you come to that conclusion?

[Schmitz]: Because [guards] were always watching each other['s] backs. Like I said, if somebody was away for more than 15 minutes, I would be checking to make sure they were okay.

¶55 Mary Bobiak, a sergeant, testified in pertinent part as follows. Bobiak sometimes worked with Wouts on Unit 4, although not often during the relevant time period.

¶56 Bobiak was "100 percent" confident that the crimes could not have happened as alleged. Specifically, as to the allegations concerning Adam, the following exchange took place between Bobiak and postconviction counsel:

[Counsel]: It's been alleged by [Adam] that [Wouts] had sex with him more than 30 times between August 1st and December 1, 2015.

Do you believe as a guard [who] works in that unit that that's even possible without detection?

[Bobiak]: No. If not detected by staff, other inmates would have seen it. And something like that would have gotten back to us immediately with a stitch [sic] note or direct contact because of the fact that [Wouts] was so disliked by the inmates, inmates would have been letting us know immediately if something was going on.

20

¶57    Ron Waas, a sergeant, testified in pertinent part as follows. Waas and Wouts had worked together over the years, and although they did not work together regularly, Waas knew Wouts "fairly well." Waas had a "high [level of] confidence" that Wouts could not have had sex in Unit 4 "more than a dozen times or dozens of times with [Adam] and not have it detected during [a] six-month period of time." Waas explained,

> You know when your partner leaves the office. You hear the doors close. You should know where your partner is at all times. I mean, don't get me wrong, you lose track once in a while, not a problem, but you notice when your partner is gone too long.
>
> If [your partner] leaves the office and closes the door behind him, those doors are heavy doors you hear. When he walks away, when he uses the bathroom in the center office or goes in the day room, you know he is gone. And so when you are gone a little too long you usually go down and check on them. You are supposed to. And I have and I usually do. Most of them do.

Waas testified that he would typically wonder where a coworker had gone after "eight to ten minutes" of absence and would likely check on a coworker after ten minutes. Therefore, Waas would not necessarily start looking for a coworker if the coworker had been gone five to seven minutes. However, Waas would "start to worry" if a coworker were routinely missing for five to seven minutes at a time.

¶58    Lindsey Hisel, an officer, testified in pertinent part as follows. She worked with Wouts on other units and sometimes, but not usually, on Unit 4. Hisel agreed that she would have become suspicious "if [she] work[ed] with a Sergeant frequently and they were disappearing for five to ten minutes at a time more than a couple dozen times." Hisel explained that she would become suspicious "[b]ecause I was always … aware of where my partner was because I

never knew what was happening," and she would "want to make sure they are okay."

¶59    Todd Anderson, a sergeant, testified in pertinent part as follows. Anderson worked with Wouts four times from August 1 through December 1, 2015, although he might also have worked with him before then. Wouts was one of the stricter sergeants at FLCI. When guards were making their rounds, they were typically "gone for three maybe five minutes," and therefore Anderson would wonder where a guard was, and would start looking for that guard, if that guard were gone as long as ten minutes. Anderson would be likely to notice patterns if a guard were routinely gone "too many times."

   B. Analysis

¶60    As previously noted, in bringing an ineffective assistance of counsel challenge, it is the defendant who "bears the burden of proving that counsel's performance was deficient and that such performance prejudiced the defense." *State v. Roberson*, 2006 WI 80, ¶24, 292 Wis. 2d 280, 717 N.W.2d 111. We conclude that Wouts has not met his burden on either of these prongs.

   i. *Deficient performance*

¶61    At the *Machner* hearing, trial counsel testified that Wouts gave him the names of four coworkers who could appear as defense witnesses. Counsel testified that his investigator attempted to contact these witnesses but that "no one ever could contact" the witnesses and that "nobody would cooperate," with the result that the defense never spoke with these witnesses. Counsel explained, "[I]n our meetings we said how else can we contact them? We've Googled their addresses at home. We've attempted to contact them. We've left messages for

them and nothing was ever returned." Counsel further testified that Wouts told him that FLCI "was preventing anybody at the institution from cooperating on his behalf."

¶62 Trial counsel testified that he could not recall the names of three of the four coworkers that Wouts told him to contact. As to the fourth coworker—Schmitz—counsel testified that at some point, at Wouts's suggestion, he took her off the list of potential witnesses, after Wouts told counsel that there were allegations of misconduct against her. Counsel also testified that Wouts told him that a different coworker could provide testimony about Wouts's not wearing underwear while biking. Because Wouts testified at the *Machner* hearing that he told trial counsel to contact Bobiak on this topic, and because Bobiak testified about this topic at the *Machner* hearing, we assume that person was Bobiak. Counsel testified that he "didn't see any relevance" to the testimony about this topic; however, he nevertheless attempted to contact this person (Bobiak), but she did not respond.

¶63 The five colleagues of Wouts who appeared at the *Machner* hearing testified that trial counsel did not contact them.[10] Moreover, Schmitz testified that she left employment with FLCI of her own volition, and she denied that there had been allegations of misconduct against her.

---

[10] A sixth FLCI employee, Wouts's supervisor, was not asked whether trial counsel ever contacted him. It is possible that this question was not relevant to Wouts's supervisor's testimony because the supervisor testified primarily about the layout of Unit 4, as opposed to an assessment of the likelihood that Wouts could have committed numerous assaults as alleged without being detected.

23

¶64     Wouts testified at the *Machner* hearing that he had told trial counsel to contact five or six coworkers and that, of those five to six coworkers, Wouts recalled telling counsel to contact Schmitz, Waas, Bobiak, and possibly Anderson.   Wouts testified to two specific topics that he told counsel the coworkers would have knowledge of:   (1) Bobiak's conversations with Wouts about bike shorts and jock straps, which inmates may have been able to overhear; and (2) how Wouts's saliva could have ended up in his trash can, where it could have been accessed by the victims.   With regard to this latter point, Wouts testified that trial counsel responded by hiring an expert on the potential transfer of DNA in saliva.   (The expert, Friedman, testified at trial.)   Wouts was not asked, nor did he testify as to, whether he later told trial counsel to take Schmitz off the list of potential witnesses.

¶65     The postconviction court did not make any credibility determinations or other findings as to whether trial counsel attempted to contact any of the witnesses who testified at the *Machner* hearing, nor did postconviction counsel request any such findings.

¶66     On this record, Wouts has not established that trial counsel performed deficiently pretrial in not obtaining the testimony later elicited from Schmitz, Bobiak, Waas, Hisel, or Anderson.   Under one reasonable view of the *Machner* hearing testimony, trial counsel made reasonable attempts to contact these or other coworkers but could not reach them, and abandoned attempts at contacting Schmitz at Wouts's request.   Moreover, counsel's testimony was not necessarily inconsistent with that of the coworkers:   counsel may have tried to contact the coworkers but was unsuccessful, in which case, the coworkers in fact would have never been contacted.   Wouts does not argue, nor may we conclude,

that counsel's performance would have been deficient under a scenario in which counsel reasonably tried but failed to reach these coworkers.

¶67    Under another reasonable view of the testimony, Wouts told trial counsel to contact the five or six coworkers because they could testify to two specific topics—that inmates may have known that Wouts wore a jock strap while biking, and how Wouts's saliva could have ended up in his trash can—and that counsel did not attempt to contact these coworkers. Wouts did not testify that he told counsel that these coworkers could testify more generally to their opinions about the likelihood that these assaults could have happened as alleged.

¶68    On this record, we cannot deem it deficient performance for trial counsel to have not successfully followed up to gain coworker testimony on these two topics. With regard to Bobiak's "jock strap" testimony, we note that there was no testimony elicited from Bobiak or anyone else that any inmate—much less, any of the victims—actually overheard this conversation. Thus, Wouts's argument rests entirely on speculation. However, even assuming that this testimony could suggest that one or more of the victims overheard a conversation between Wouts and Bobiak indicating that Wouts wore a jock strap while biking, this testimony would be of such minimal value that failure to pursue it cannot possibly rise to the level of deficient performance. That the victims may have known that Wouts wore an (undescribed) jock strap while biking has little to no bearing on Walt's and Chad's allegations that, during the sexual assaults Wouts committed while at his workplace, Wouts wore colorful "ass-less" underwear that they testified was similar in appearance to the underwear actually retrieved from Wouts's home.

¶69    Likewise, we cannot conclude it would constitute deficient performance for counsel to not successfully pursue coworker testimony on Wouts's eating, drinking, and trash disposal habits, given that counsel already intended to (and ultimately did) introduce expert witness testimony on the possibility that DNA could have been transferred from "secondary" items like a cup or glass, an issue we discuss in more detail in our prejudice analysis below.

¶70    It was Wouts's burden to establish that counsel's performance was deficient—including by obtaining the evidence and findings necessary to support that claim. His failure to do so means that his ineffective assistance claim fails.

### ii. Prejudice

¶71    We may reject Wouts's ineffective assistance claim based solely on his failure to establish deficient performance. *See Strickland*, 466 U.S. at 697. Nonetheless, many of Wouts's arguments on appeal relate to other aspects of the coworker testimony not discussed above. Therefore, for the sake of completeness, we now examine whether counsel's performance, if deficient, prejudiced Wouts. We conclude that Wouts was not prejudiced. That is, Wouts has not shown that, had the above *Machner* hearing testimony been presented at trial, there would have been a reasonable probability of an acquittal. *See Strickland*, 466 U.S. at 694, 697.

### (a) Likelihood that correctional staff or other inmates would have discovered a sexual assault

¶72    Wouts argues that the testimony of FLCI correctional staff shows that "it was virtually impossible that these allegations, as testified to by the accusers at trial, could have occurred." Wouts therefore argues that, had this

26

testimony been presented at trial, the jury would have had a reasonable doubt that he committed some or all of the offenses charged.

¶73    We disagree.  We have discussed the *Machner* hearing testimony of Wouts's coworkers at length.  As we now explain, none of this testimony, even if fully credited, creates a reasonable probability that the jury would have had a reasonable doubt about Wouts's guilt based on the theory that he could not have committed any of these assaults.  The coworkers testified to two main points about the behavior of correctional officers, neither of which supports the reasonable probability prong in the context of the testimony that was presented at trial.

¶74    First, the coworkers testified that they would become suspicious, start to worry, or start looking for a coworker if that coworker were gone for a particular length of time.  Specifically, Anderson and Waas both testified that they would start looking after ten minutes had passed, and Schmitz testified that she would "probably" start looking after fifteen minutes had passed.  But there was no evidence presented at trial that any of the assaults, either charged or uncharged, took more than ten minutes.  With respect to the five charged assaults, none of the victims testified that they lasted longer than three minutes.  Moreover, although Walt and Adam testified to more assaults than were charged, there was no testimony that any assault took ten or more minutes—the least amount of time that, according to the *Machner* testimony, would allegedly prompt a coworker to

look for Wouts.[11] And, as previously mentioned, there was evidence at trial that Wouts avoided being gone long enough to draw suspicion, at one point commenting to Walt that he had been gone too long and ending the sexual contact shortly after it had started. Therefore, the coworker testimony is consistent with the victims' testimony, insofar as the coworker testimony specifically concerns the amount of time that any given assault could have lasted without drawing suspicion.

¶75    Second, the coworker testimony concerns the likelihood that these assaults could have happened with some level of frequency. That is, the testimony goes to the likelihood that Wouts could have assaulted inmates on multiple occasions without being discovered by other guards or inmates. At trial, Chad testified to one assault. Walt testified to three assaults in detail, but he also testified that he was assaulted "nine or ten or 20 times or however many times it was." Adam testified about "a lot" or "over a dozen" assaults.

¶76    At the *Machner* hearing, the coworkers testified that they would have noticed or become suspicious of a guard's absences on multiple occasions, or that somebody would have eventually or necessarily interrupted a guard who was engaging in multiple sexual encounters within a given time period. The questions posed by postconviction counsel centered on discrediting Adam's account of "a lot" of assaults in 2015. For example, Schmitz testified that, if a

---

[11] In his appellate brief, Wouts implies that Adam testified that Wouts's assaults generally lasted up to fifteen minutes. In fact, Adam testified that one sexual assault in the bathroom lasted "five to seven" minutes but not "longer than 15 minutes," although he then qualified that last statement, testifying that "it wasn't that long." Moreover, Adam testified that when he would meet Wouts in the basement, he himself would go down to the basement before Wouts and wait there "[a]pproximately like 15 minutes" before Wouts would come down.

guard had sex in the bathroom "dozens of times," "it would be pretty likely somebody else would notice." Schmitz also testified that it would not be "possible" that an inmate could have had sex "dozens or maybe 50 times between August 1st and the end of November." Bobiak testified that it would not be possible that Wouts could have had sex with Adam "more than 30 times between August 1st and December 1, 2015." Waas testified that Wouts could not have had sex with Adam "more than a dozen times or dozens of times … during [a] six-month period."

¶77 Preliminarily, as briefly noted above, we observe that this coworker testimony was offered in response to questions by postconviction counsel that consistently misrepresented the substance of the trial testimony. Adam testified at trial that he had sex with Wouts "a lot" or "over a dozen" times during the eight- or nine-month period between February or March and November 2015—not that he had sex "maybe 50 times" between August and December 2015.[12]

¶78 But to the extent the coworkers testified that Wouts could not have had sex with Adam "a lot" or "over a dozen" times between February or March and November 2015, we conclude that this evidence would have been insufficient

---

[12] At the *Machner* hearing and in his briefing, Wouts relies on testimony from a federal civil court proceeding that occurred after the criminal trial in this case. Specifically, around or after the time Wouts was convicted, Adam sued Wouts in federal court. An evidentiary hearing occurred in the federal civil suit after the criminal trial was completed. During that hearing, Wouts's captain testified that Adam told him that there was "sexual activity between" him and Wouts "50 to 55 times." At the criminal trial, however, Adam did not definitively testify to fifty to fifty-five instances of sexual activity, instead merely emphasizing that there were "a lot" of assaults. We note that at one point at trial, Adam agreed that he could have told investigators that there were fifty or fifty-five assaults; however, on further questioning, Adam expressly declined to testify to a given number of assaults and simply stated that there were "a lot." Wouts does not attempt to explain how testimony from a civil proceeding that took place *after* the criminal trial in this case would have any bearing on whether counsel was ineffective in the criminal case.

to create a reasonable probability of a different outcome at trial. Even fully crediting the coworkers' testimony that they believed that Wouts could not have had repeated sex without being discovered (given the assumed numbers of alleged assaults over the assumed time periods), these witnesses did not testify that these assaults did not occur; they only explained why they thought they could not have occurred with some regularity. However, the additional evidence elicited to support this testimony is consistent with the victims' testimony at trial. For example, the coworkers testified that sound travels throughout Unit 4, but they also testified that a person standing outside the bathroom might not hear noise inside the bathroom unless that person were listening. This is consistent with the trial testimony, which showed that a person in the hallway could talk to someone in the bathroom through the grate. Moreover, the *Machner* hearing evidence also included a coworker's testimony that there was "no expectation" that if Wouts were in one of the inmate bathrooms, a coworker would be in a location to hear noise in that bathroom during the third shift.

¶79    The coworkers further testified that there was a lot of inmate traffic in and out of the bathroom. But the jury in fact heard testimony that inmates were able to leave their cells and that they used the bathroom during the night. Thus, the jury was able to assess the likelihood that sexual contact between two people in the bathroom on multiple occasions would be detected. In any event, many of the assaults that Adam testified to occurred in the basement and laundry room, where inmates could not freely enter and where there were no cameras. Moreover, although a person standing outside the bathroom could see into the bathroom through the grate, that observer could not see into the bathroom stalls. The jury also heard how Wouts picked a certain stall for his assaults, presumably to avoid detection.

30

¶80 The jury also heard testimony from multiple witnesses on other ways in which Wouts sought to avoid detection. For example, the jury heard that Wouts would pick the time and location of the assaults to coincide with when he believed locations within Unit 4 would be unoccupied. Moreover, the jury heard that Wouts would bring a ladder with him into the bathroom to make it appear that he was looking for contraband in the ceiling panels (and thus had a valid reason for being in the bathroom). The jury also heard that Wouts knew where the camera blind spots were and used this knowledge to avoid detection.

¶81 For all of these reasons, the *Machner* hearing testimony provides more detail about the behavior of the guards, but is consistent with the trial testimony. Accordingly, we conclude that the coworker testimony on the likelihood of Wouts's escaping detection would not have created a reasonable probability of a different outcome at trial.

### (b) *Wouts's theory that he was framed*

¶82 Wouts argues that the jury should have, but did not, hear testimony supporting his theory that he was framed. Specifically, Wouts points to *Machner* hearing testimony showing that: (1) inmates could see into the offices or "bubbles" of correctional staff; (2) Chad became a janitor on August 21, 2015, "three days prior to the earliest allegation"; (3) janitors assigned to clean the bubbles would be able to remove and save trash, and they would know that the trash they were taking belonged to a given officer; and (4) inmates would have been able to see Wouts eating and drinking and would know, for example, that Wouts spit his sunflower seeds into a Styrofoam cup. Wouts implies that this testimony would have changed the outcome of trial by providing a clearer theory as to how Chad and Walt could have obtained his DNA in an effort to frame him.

¶83   We disagree.   It is true that the *Machner* hearing witnesses provided more detail than the trial witnesses as to how Chad or another inmate could have stolen items containing Wouts's DNA.  But this testimony does not introduce any significant new facts about Wouts or the victims; nor does it allow for arguments not already made to the jury.  The evidence at trial was that Chad had more access to areas within Unit 4 because he was a janitor.  In addition, the jury heard testimony that, even before Chad was a janitor, Chad, Walt, and Adam spent time in Wouts's office "quite a bit" because Wouts frequently invited them to be there.  Moreover, the State's and Wouts's experts both testified that there was no way to tell how Wouts's DNA came to be found on Walt's underwear.  The jury also heard the testimony of Wouts's expert that the DNA could have come from a "secondary" source like "a cup, glass, silverware, [or] tooth brush."

¶84   Based on this evidence, trial counsel was able to argue to the jury that Chad and Walt together had the means and opportunity to plant Wouts's DNA on their underwear.  Counsel further presented evidence and argued to the jury that the victims had motives to frame Wouts, namely:  because they did not like Wouts; because they intended to sue the State; and, in Walt's case, because he believed that alleging a sexual assault might benefit him at an upcoming sentencing modification hearing.  Therefore, the jury in fact heard the "DNA planting" theory and learned of Wouts's explanation for how and why the victims could have concocted a scheme.

¶85   Against this backdrop, the *Machner* hearing testimony does not provide any significant new facts.  Had this testimony been presented at trial, the jury could have speculated that one or more of the victims had additional ways to obtain Wouts's DNA (for example, by stealing particular items from Wouts's trash that contained his saliva).  But, as noted, the jury already heard testimony

that Chad was a janitor and that all three victims frequently entered Wouts's bubble. Thus, the testimony of the coworker witnesses suggests further theories about how Wouts's DNA could have been obtained, but it does not meaningfully add to the evidence already presented at trial suggesting that Wouts could have been framed. Accordingly, we conclude that there is no reasonable probability of an acquittal had this additional "DNA planting" evidence been presented to the jury.[13]

### III. Counsel Was Not Ineffective for Repeatedly Misstating or Mixing Up Names and Other Facts.

¶86 Wouts argues that trial counsel repeatedly mixed up the names of Wouts and the victims and misstated other facts and, in doing so, undermined key testimony. We discuss and analyze the three main types of mistakes that counsel made. For each type of mistake, we conclude that Wouts's ineffective assistance of counsel claim fails.

---

[13] Wouts also directs us to the testimony from the *Machner* hearing showing that inmates may have been aware that videos from some FLCI cameras were retained for only seven days. He further points to hearing evidence showing that inmates received an orientation about the Prison Rape Elimination Act (PREA), that there were posters about PREA hung around FLCI, and, therefore, that inmates knew that they had the ability to report sexual assaults through the PREA hotline. Wouts does not state how this evidence supports his ineffective assistance claim. Accordingly, we do not address any argument related to this testimony. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

Wouts also states that trial counsel's brother, who worked at the same law firm as trial counsel, represented Wouts in the federal civil case against him. Wouts implies that this circumstance somehow influenced counsel's *Machner* hearing testimony. Wouts again does not develop this argument beyond speculation or indicate how this factor pertains to his ineffective assistance of counsel claim. We therefore do not address it. *Id.*

¶87    For clarity, in this section, we need to use additional pseudonyms to refer to the last names of the victims.  Therefore, we call Walt "Walt Stute," Chad "Chad Arnold," and Adam "Adam James."[14]

A.  Trial counsel's mixing up Walt Stute's and Alex Wouts's names

¶88    Wouts points out that trial counsel repeatedly misstated or mixed up the names "Alex Wouts" and "Walt Stute," as follows:[15]

- In his opening statement, counsel referred to Wouts as "Mr. Stute."

---

[14]  For ease of reading, where quoting from the transcript and briefing in this section, we do not add brackets to indicate our use of pseudonyms.

[15] In this portion of his brief-in-chief, Wouts also argues that trial counsel was ineffective during his cross-examination of Chad because he once referred to Walt as Chad.  We conclude that this mistake does not constitute performance outside "the wide range of professionally competent assistance." *See Strickland v. Washington*, 466 U.S. 668, 690 (1984). Moreover, Wouts has not shown how this mistake was prejudicial in the context of the overall trial.  *See id.* at 694.  Accordingly, we reject this argument.  Along similar lines, Wouts argues that counsel was ineffective for misidentifying the number of a trial exhibit and then correcting himself, but Wouts does not offer any analysis under the ineffectiveness standard.  Therefore, we reject this argument as well.  *See Pettit*, 171 Wis. 2d at 646.

In addition, Wouts argues that trial counsel was ineffective during his cross-examination of Walt because he misstated Walt's testimony (Walt testified that Chad used his influence with Wouts to get Walt transferred to Unit 4).  Counsel stated, "You wanted Chad on your unit, correct?" and Walt responded, "You are mistaken right now.  It's the other way around.  Chad got me on his unit.  You are confused."  Wouts argues that counsel therefore "missed a key opportunity to make an argument that was helpful for Wouts."  Wouts, however, does not explain (and the record does not demonstrate) which argument counsel could have, but did not, make.  Rather, the record reflects that trial counsel corrected himself and asked Walt further questions about Chad's helping Walt get transferred to Unit 4.  Therefore, Wouts has not shown why counsel's mistake constitutes deficient performance or why this mistake prejudiced his defense.  *See Strickland*, 366 U.S. at 690, 694.  Accordingly, we do not discuss this point further.  *See Pettit*, 171 Wis. 2d at 646.

- While asking Chad a question during cross-examination, counsel substituted "Stute" for "Wouts." Counsel then immediately corrected himself, saying, "I'm sorry, I'm saying Stute. Wouts. My bad."

- During Chad's cross-examination, counsel asked Chad where in Unit 4 Wouts had spoken with Chad about meeting for oral sex. Chad responded that "it was in the office on our wing." The following exchange then occurred:

  [Trial counsel]: Would it be in Stute's office or the other Sergeant's office?

  The court: Now, Stute doesn't have an office, does he?

  [Trial counsel]: I'm sorry. I keep on messing—I am mixing them up.

  The court: Are we ready to take a break or do you want to go a little bit longer?

  [Trial counsel]: We can go. I'll be more careful about Stute and Wouts.

  The court: I wasn't there. Does Stute have an office?

  [Chad]: No.

  The court: Okay.

- During counsel's cross-examination of Walt, the following exchange occurred:

  [Trial counsel]: So how often did Alex Stute come into your office and go through all your belongings?

  [Walt]: Who is Alex Stute?

  [Trial counsel]: I'm sorry.

  The court: Alex Stute doesn't have an office if I remember right.

35

> [Trial counsel]: It's me. I am getting your [Walt's] name
> screwed up with Wouts.

- During another portion of Walt's cross-examination, counsel again referred to Wouts as "Alex Stute." Counsel was corrected and again stated, "I'm sorry. I keep on doing that. I apologize. Alex Wouts."

¶89 Wouts has not shown that these mistakes constitute deficient performance. The requirement that trial counsel render constitutionally effective assistance is not a requirement that counsel perform perfectly, and there is no such thing as an error-free trial. *See Strickland*, 466 U.S. at 687-91. Wouts has not explained why trial counsel's performance was outside "the wide range of reasonable professional assistance" simply because counsel made (and immediately corrected himself when he made) the errors described above. *See id.* at 689.

¶90 Moreover, because trial counsel immediately corrected himself, Wouts has not shown (and the record does not demonstrate) why we should conclude that these mistakes confused the jury and therefore prejudiced him at trial. *See id.* at 694. We therefore conclude that counsel did not render ineffective assistance by making the above mistakes.

B. Trial counsel's mixing up Chad Arnold's and Adam James's names during his direct examination of P.H.

¶91 Wouts argues that trial counsel conflated the names of two of the victims, Chad Arnold and Adam James, and, in doing so, undermined key testimony of a defense witness, whom we identify as P.H. P.H., an inmate at FLCI, testified at trial that, around December 2015, he observed Walt being taken out of segregation where Walt had been placed following the "situation" with

Wouts. At the same time, Chad was walking through that common area. According to P.H., Walt shouted to Chad, "[S]tick with the story and we'll be okay." P.H. did not provide any more details about what he overheard, but the jury was apparently meant to infer that Walt was telling Chad to continue to (falsely) allege that Wouts had sexually assaulted them.

¶92 To establish P.H.'s familiarity with the victims, trial counsel initiated the following exchange, in which counsel referred to Chad Arnold as "Chad Adam" (*i.e.*, in place of Chad's last name, counsel used Adams's first name):[16]

> [Trial counsel]: Do you know a Chad Adam?
>
> [P.H.]: I don't know him. I have seen him.
>
> [Trial counsel]: Do you know what he looks like?
>
> [P.H.]: Yes.
>
> [Trial counsel]: When I say you have seen him [I mean] you know who the person is?
>
> [P.H.]: Yes.
>
> [Trial counsel]: But what you are saying is you don't know him personally, but you know him by name?
>
> [P.H.]: Yes.
>
> [Trial counsel]: Directing your attention to sometime in December, did there come a time in which you had contact with both Walt Stute and Chad Adam?
>
> [P.H.]: Yes.

---

[16] The court reporter appropriately inserted the word "sic" after "Chad Adams," which we omit throughout for ease of reading.

37

¶93    On cross-examination, the State seized on trial counsel's mistake to imply that P.H. was not telling the truth:

| | |
|---|---|
| [The State]: | Mr. P.H., how well do you know Chad Adam? |
| [P.H.]: | I don't. |
| [The State]: | Okay.  Would it surprise you to learn that there is no such person? |
| [P.H.]: | That's not what the white shirts[17] said. |
| [The State]: | That's not what I am asking you.  What I am asking you is—well, let me ask it this way:

Your testimony is that Walt Stute spoke with Chad Adam? |
| [P.H.]: | Yeah. |

¶94    Trial counsel, in turn, attempted damage control on re-direct examination by showing P.H. a picture of Chad:

| | |
|---|---|
| [Trial counsel]: | I show you [a picture of Chad], is that who we just said was Chad Adam? |
| [P.H.]: | Yes. |
| [Trial counsel]: | And what's the name on there?  It's not Adam? |
| [P.H.]: | Chad.  Chad Arnold. |
| | …. |
| [Trial counsel]: | So when I asked you the name, was that the wrong name? |
| [P.H.]: | Yes. |

---

[17]  The jury heard testimony that inmates referred to correctional staff as "white shirts."

[Trial counsel]: Is the person in that [photograph] the person that Walt Stute talked to?

[P.H.]: Yes, it is.

[Trial counsel]: And you are positive about that?

[P.H.]: Yes.

[Trial counsel]: And after you heard this, what did you do?

[P.H.]: I … spoke with the white shirt in control. And they had showed me a picture of [Chad] after I had described what he had looked like.

[Trial counsel]: So you immediately reported it to a white shirt?

[P.H.]: Yes.

P.H. also introduced testimony and evidence that P.H. reported to a guard the statement he allegedly heard Walt tell Chad, and that the guard wrote a memo documenting the incident.

¶95 In closing argument, the prosecutor referenced the above exchanges to argue that P.H. was not believable. The prosecutor argued that P.H. "rattled off" his "prepared" statement and was "not credible" because he did not question trial counsel's use of the wrong name. The prosecutor further argued that P.H.'s number of convictions made him a less believable witness than the victims. Trial counsel, in turn, explained that his own mistake did not reflect on P.H.'s veracity:

> And I take the responsibility of using the wrong name. That I did. I have dyslexia.[18] I even said Alex

---

[18] Wouts points out that trial counsel later testified at the *Machner* hearing that he does not actually have dyslexia. Wouts argues that counsel "should not have claimed he had 'dyslexia' as an explanation for his plethora of errors." Wouts does not explain, however, how counsel's claiming to have dyslexia at trial pertains to our ineffectiveness analysis. Accordingly, we do not consider this point further. *See Pettit*, 171 Wis. 2d at 646.

Stute a few times. I was mistaken. That's my mistake. But I showed [P.H.] the picture [of Chad] and [I said] is that who [Walt] yelled to. Yes. We have that fact. Why do we have that fact is because … Walt shouts to Chad stick with your story and we'll be okay. Did P.H. just make that up[?] Did he make up the dates[?] No. The dates corroborate. That's not made up.

What does Mr. P.H. have to—he is not friends with anybody here. What does he have to gain by doing that[?] Nothing. What he said is I heard this and I thought it was wrong. So I [went] and told the white shirt.

So what d[id] I do[?] I brought the white shirt in and said when you heard this you documented it. Yes, I did. And you turned that memo into your boss. Yes, I did because I thought it was important.

¶96 On appeal, Wouts argues that trial counsel's error "led the jury away from the main point[,] which was that P.H. had heard two of the three accusers conspiring to keep their story straight (*i.e.*, 'Stick with the story and we'll be ok') in order to pursue a civil lawsuit against Wouts." Moreover, Wouts argues, counsel's error allowed the prosecutor to "insinuate[] that P.H. was a liar."

¶97 Again, Wouts does not present any detailed argument as to why trial counsel's error was of such magnitude as to constitute deficient performance. *See **Strickland***, 466 U.S. at 690. But even assuming without deciding that counsel's performance was objectively deficient, Wouts fails to show that there is a reasonable probability that the outcome of trial would have been different had counsel not referred to Chad Arnold as "Chad Adam." *See **id.*** at 694. First, counsel provided a credible explanation, backed up by P.H.'s testimony, for P.H.'s not correcting counsel's wrong use of Chad's name (*i.e.*, that P.H. knew Chad by sight but not by full name). Second, the jury had already seen counsel make numerous mistakes with names, as detailed above. For this reason, the jury

40

had ample reason not to attach meaning to counsel's mistaken use of the name "Chad Adam." Third, in closing, counsel again provided context for his mistake: P.H. knew Chad by sight and had, in fact, reported the conversation to a guard at the time it happened.

¶98 Fourth, there was little context for the statement that P.H. allegedly overheard, in that it was a single statement not elaborated on or tied to other evidence. Therefore, the jury could very well have simultaneously believed P.H.'s testimony and *not* concluded that Walt was discussing a false assault allegation. Fifth, the jury may simply have chosen to believe the three victims over the testimony of an inmate with a greater number of convictions (Chad and Walt denied P.H.'s account). Finally, and importantly, the jury could have believed that Walt was telling Chad to "stick with" a *true* story about Wouts's sexual assault (*i.e.*, that Walt was telling Chad to cooperate with the investigation of Wouts).

¶99 For all these reasons, Wouts fails to show prejudice and, therefore, trial counsel did not render ineffective assistance in this regard.

C. Trial counsel's misstating a date during his direct examination of T.F.

¶100 Wouts argues that trial counsel rendered ineffective assistance during his direct examination of defense witness T.F. T.F., an inmate, testified that an FLCI captain and a detective interviewed him as part of the investigation of Wouts. According to T.F., these interviewers "tr[ied] to get [T.F] to say that" Wouts assaulted him "even though [T.F.] stayed with the statement that nothing ever happened." T.F. further testified that the interviewers promised to move him "to a minimum [security prison] and have part in a class action lawsuit" if he would "change [his] story." The captain, for his part, testified that he never

41

pressured or made any promises to T.F. in an attempt to coerce T.F. into accusing Wouts of sexual assault.

¶101   As part of this direct examination, trial counsel asked T.F. if the interview took place in "December of 2017," even though the correct year was 2015.  T.F. responded, "Yes."  During closing argument, the prosecutor implied that T.F. was not being truthful and was simply giving a prepared response because the interview happened in 2015, not 2017.  The State further pointed out that the captain's testimony refuted T.F.'s and that T.F. had eight prior convictions.  On these grounds, the State argued, T.F. was "simply not a credible witness."

¶102   On appeal, Wouts argues that trial counsel "bungled the exculpatory evidence" by getting T.F. to agree that the interview happened in 2017.  Thus, Wouts summarily asserts, counsel's "mistakes caused prejudice to Wouts."  But Wouts again does not engage with the "deficient performance" standard by explaining why a reasonably competent attorney would not make this type of mistake.  *See id.* at 690.  Moreover, and importantly, Wouts simply assumes prejudice, specifically:  (1) that the jury did not believe T.F.; (2) that the jury did not believe T.F. *because of* counsel's mistake; and (3) that, had the jury believed T.F., the outcome of his trial would have been different.  *See id.* at 694.  But the jury heard the captain's testimony that the interview with T.F. did not involve coercion or promises, and it may simply have chosen to believe an FLCI captain over T.F., an inmate with eight convictions.  Moreover, even if the jury had found that T.F. was telling the truth, it nevertheless could have believed that Wouts assaulted other victims.  That is, T.F.'s testimony does not materially undermine Chad's, Walt's, and Adam's allegations.  We therefore conclude that Wouts has not demonstrated ineffective assistance of counsel in this regard.

*IV. Wouts Is Not Entitled to a New Trial on the Basis of Newly Discovered Evidence.*

¶103 In the alternative, Wouts argues that the evidence obtained during postconviction proceedings and summarized above is newly discovered evidence entitling him to a new trial. As stated, to set aside a judgment of conviction based on newly discovered evidence, the defendant must prove, among other criteria, that he or she was "not negligent in seeking the evidence." *Plude*, 310 Wis. 2d 28, ¶32.

¶104 Wouts has not made any showing or argument that he was not negligent in obtaining this evidence pretrial. In fact, Wouts appears to concede this point in the State's favor, in that that he argues that he "himself was not negligent in seeking this evidence, but his attorney was." Wouts does not otherwise engage with this standard, instead simply arguing that the "evidence is newly discovered evidence as [trial counsel] had none of this evidence prior to the jury trial." Such argument misapplies the law, in that it ignores the "negligence" criterion. Accordingly, Wouts has not demonstrated that the circuit court erroneously exercised its discretion in denying this claim. *See id.*, ¶31

**CONCLUSION**

¶105 For the foregoing reasons, we affirm Wouts's judgment of conviction and the circuit court order denying Wouts's postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.